IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

O'FLANNAGAN V. OCHSNER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

PATRICK O'FLANNAGAN, APPELLEE,
V.
ELIZABETH OCHSNER, APPELLANT.

Filed May 6, 2014.    No. A-13-773.

Appeal from the District Court for Adams County: TERRI S. HARDER, Judge. Affirmed.

Roger G. Steele and Liana Steele, of Steele Law Office, for appellant.

Peter C. Wegman, Mark R. Richardson, and Sheila A. Bentzen, of Rembolt Ludtke, L.L.P., for appellee.

INBODY, Chief Judge, and MOORE and PIRTLE, Judges.

MOORE, Judge.

Following a jury trial, Patrick O'Flannagan was awarded $500,000 in damages in his personal injury action against Elizabeth Ochsner. In this appeal, Ochsner argues that the trial court erred when it admitted certain evidence and when it instructed the jury. She also alleges that the jury's verdict was excessive. For the reasons set forth herein, we affirm the judgment of the district court.

FACTUAL BACKGROUND

O'Flannagan owns and works full time at Pat's Auto Repair and Towing (Pat's Auto Repair) in Hastings, Nebraska. In June 2010, Pat's Auto Repair was a contractor for AAA, a road service company, and provided automobile repair service, emergency roadside service, and towing services to AAA members. On June 17, Pat's Auto Repair received a call to respond to a "lock out" for AAA member Ochsner. O'Flannagan had done work for Ochsner previously, including unlocking her car, "jump starting" her car, and changing flat tires. O'Flannagan was aware that Ochsner was a woman approximately 80 years of age.

- 1 -

When O'Flannagan arrived, he observed that Ochsner's car was in her driveway and that the car was running. O'Flannagan parked his service van to the side of Ochsner's car. After he quickly unlocked the car, O'Flannagan requested to see Ochsner's AAA membership card. Ochsner informed him that she needed to retrieve it from her car, and O'Flannagan began to return his tools to his van. While he was putting the tools into the van, Ochsner put her car into reverse and her open driver's door struck O'Flannagan's leg, propelling him into the door of the van. O'Flannagan loudly instructed Ochsner to pull the car forward. Ochsner heard O'Flannagan's instruction and complied. However, Ochsner put the car in reverse a second time and struck O'Flannagan again. O'Flannagan repeated his earlier instruction that Ochsner had to pull forward. She complied, and O'Flannagan quickly left, driving his van back to the shop. As a result of O'Flannagan's being pushed against the van's door, the door and the door's hinge were bent. O'Flannagan experienced immediate pain in his leg and wrist.

On October 25, 2011, O'Flannagan filed a complaint in the district court, alleging that he had been injured due to Ochsner's negligence. O'Flannagan specifically alleged that he sustained "crush injuries" to his right leg, some of which were permanent. O'Flannagan alleged that he had incurred medical expenses in an amount not less than $1,260.20 and that he may be required to seek additional medical care in the future. He also claimed lost wages in an amount not less than $10,000; impairment to future earning capacity; and physical pain, mental suffering, and inconvenience. At trial, O'Flannagan made an oral motion to amend the complaint to add allegations of injuries to his right wrist and back. The district court granted the motion after there was no objection from Ochsner.

A jury trial was held beginning on June 10, 2013. On the first day of the trial, Ochsner admitted fault, but reserved the issue of causation of damages for the jury. O'Flannagan testified to the incident and the injuries he sustained. In addition to his leg and wrist injuries, O'Flannagan testified that he developed back pain from the incident. O'Flannagan also testified that he continued to have pain in his right leg and back at the time of trial and that he had lost a considerable amount of strength in his right wrist. He stated that he was no longer able to do much of the work for his business that he was doing prior to the accident and had lost considerable income as a result. O'Flannagan called a number of witnesses who supported his testimony regarding the extent of his injuries and the effects of these injuries on his profession as a mechanic and tow truck operator.

At the time of trial, O'Flannagan was approximately 64 years old. During the trial, he conceded that he had been a smoker during much of his life. He testified that he generally smoked a pack of cigarettes a day. O'Flannagan also admitted that he was diagnosed with colon cancer in early February 2010 and had undergone surgery during which 18 inches of his intestine were removed. Following 3 weeks of recovery from the surgery, O'Flannagan claimed that he had a clean bill of health. At the time of the incident, O'Flannagan believed his health was good and claimed that he was able to perform any towing service or repair job in his shop, including the jobs that required heavy lifting. O'Flannagan also testified that he did not suffer any other traumatic injury from the period between his incident with Ochsner and filing this lawsuit.

Since sustaining his injuries, O'Flannagan has been examined by and received treatment from a number of doctors. Dr. Fred Catlett, O'Flannagan's longtime family physician, testified at trial to the care he provided. Catlett conducted an initial examination of O'Flannagan's injuries

the day of the incident and was the first medical professional to provide treatment. In fact, Catlett was the only doctor to observe or treat O'Flannagan's injuries prior to the initiation of the lawsuit. According to Catlett, when O'Flannagan initially came in for treatment, his complaints were of pain in his leg and wrist. However, this pain did not subside, and eventually, O'Flannagan began to complain of pain in his back.

When Catlett's initial efforts did not provide relief and O'Flannagan continued to experience pain in his leg, Catlett suspected a potential nerve injury. Catlett referred O'Flannagan to Dr. Lorraine Edwards, a neurologist in Hastings, to obtain a nerve conduction study. Catlett testified that he does not conduct these studies himself because he does not have the necessary equipment.

Edwards completed a nerve conduction study on O'Flannagan's right leg on October 25, 2011. Exhibit 33, entitled "Electrodiagnostic Evaluation Report," contains the results from this study. The first page of the report contains the following entries:

> **Subjective**: Patient here after accident that apparently wrenched his knee leaving him with pain and paresthesia in the right leg.
>
> **Objective**: electrodiagnostic evaluation shows normal nerve conduction studies. Needle exam reveals some radicular changes in L5 and S1.
>
> **Assessment**: lumbar radiculopathy on the right. I do not know all the details of his trauma, but apparently there was some twisting and swelling in the leg and compartment syndrome was entertained as a possible diagnosis. At this point there is no evidence of peripheral nerve damage or neuropathy in the right leg. It is possible that the twisting motion may have tugged on the roots or aggravated pre-existing lumbar stenosis.
>
> **Plan**: MRI of the lumbar spine should be considered if not already done. Cannot totally rule out regional pain syndrome based on exam and study results. If this is possible suggest evaluation at pain clinic for appropriate treatment in view of his other health issues.

The report also contains graphs and tables related to the study which were not explained at trial. Edwards did not provide any testimony at trial.

O'Flannagan questioned Catlett about the results of the nerve conduction study. Ochsner objected to this questioning, because the report had not been accepted into evidence. In response to her objection, O'Flannagan offered the report. Ochsner then objected to O'Flannagan's offer of the exhibit on the grounds of foundation, relevance, and hearsay. The district court allowed O'Flannagan to further question Catlett related to his use of the report from the study. Catlett testified that he kept this study as part of his normal office records and stated that he relied upon this type of study when diagnosing and treating patients. O'Flannagan reoffered the report, and the district court admitted it into evidence over Ochsner's objections.

Catlett explained this nerve conduction study was an objective test which demonstrated that O'Flannagan presented with L5-S1 lumbar radiculopathy. This test confirmed Catlett's suspicions that the extent of O'Flannagan's injuries expanded beyond the initially reported calf pain.

Catlett eventually referred O'Flannagan to Dr. Gary Chingren. Chingren has practiced medicine in Hastings as an orthopedic surgeon for 33 years. He first saw O'Flannagan in October

2011 and observed O'Flannagan with pain in his leg. Chingren initially recommended that O'Flannagan take an antiinflammatory to reduce that pain. When O'Flannagan's pain continued, Chingren suspected a potential nerve issue and recommended a series of epidural steroid injections in the lower back area. O'Flannagan received these injections and also underwent an MRI examination of his lower back. The MRI revealed O'Flannagan had disk disease, facet disease, disk bulging, and stenosis in his back. Chingren noted that these conditions were a normal part of the aging process and often worsened with age. However, Chingren also stated that a person may have these conditions and not experience any pain. In his opinion, without an MRI immediately preceding the injury, it was not possible to determine whether the changes in O'Flannagan's spine were trauma related.

Dr. Geoffrey McCullen, an orthopedic spine surgeon, examined O'Flannagan to determine whether surgery was a viable treatment option. After reviewing his medical history along with the various test results, McCullen determined that O'Flannagan had preexisting degenerative arthritis in his back, but concluded that his back pain could not be relieved by surgery. McCullen testified that he believed O'Flannagan's symptoms were caused by the incident in June 2010, but conceded that there could have been other events that caused his back pain.

Dr. John Dungan, an anesthesiologist and the chief of anesthesia at a hospital in Hastings, administered a series of three steroid injections to O'Flannagan between December 2011 and January 2012. Each injection was at a slightly different area in O'Flannagan's lower back. O'Flannagan did not improve after this series of injections.

Dr. Paul Rodriguez, a radiologist with a subspecialty in spine injections for back and leg pain, administered two further injections to O'Flannagan. When Rodriguez first examined O'Flannagan, he noted that O'Flannagan reported a pain level of 7 out of 10. Rodriguez also documented that O'Flannagan reported having chronic low-back pain for a number of years. This type of pain often generates a pain level of 1, 2, or 3 out of 10. Before administering the injections, Rodriguez also reviewed O'Flannagan's MRI results and observed degenerative changes with mild stenosis and prominent facet arthritis. However, Rodriguez' opinion, based on a reasonable degree of medical certainty, was that O'Flannagan's incident with Ochsner likely acutely exacerbated his back pain.

At Ochsner's request, O'Flannagan was also examined by Dr. Charles Taylon. Taylon, a neurosurgeon, examined O'Flannagan on July 10, 2012. During his examination, Taylon took a history of O'Flannagan and became aware of the details of the incident involving Ochsner. Taylon also reviewed O'Flannagan's medical history, the MRI, and the nerve conduction study results. Taylon concluded that O'Flannagan's right leg and arm were injured when Ochsner struck him, but Taylon did not believe there was any connection between O'Flannagan's back ailments and the accident.

On June 12, 2013, the case was submitted to the jury. On the same day, the jury returned a verdict in favor of O'Flannagan in the amount of $500,000. Ochsner filed a motion for a new trial raising a number of issues, including irregularity in the proceedings, surprise, excessive damages, a jury instruction error, and improper receipt of evidence. The trial court overruled this motion after a hearing. Ochsner has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Ochsner alleges, restated and renumbered, that the district court erred (1) in admitting exhibit 33, Edwards' electrodiagnostic evaluation report, into evidence, and (2) in instructing the jury that Ochsner was liable for all damages if the damages caused by the accident could not be separated from those caused by preexisting conditions. Ochsner also alleges that the jury's verdict was excessive.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *In re Invol. Dissolution of Wiles Bros.*, 285 Neb. 920, 830 N.W.2d 474 (2013). A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of discretion. *Id*.

Whether a jury instruction is correct is a question of law, which an appellate court independently decides. *Kuhnel v. BNSF Railway Co.*, 287 Neb. 541, ___ N.W.2d ___ (2014).

The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006). An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. *Bedore v. Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011).

## ANALYSIS

*Admissibility of Exhibit 33.*

Ochsner assigns error to the district court's admission of exhibit 33 into evidence. She argues that this exhibit contained inadmissible hearsay, was irrelevant, and lacked foundation. Ochsner also argues that she was denied the opportunity to cross-examine Edwards regarding the report and was surprised by its use at trial because Edwards was not a disclosed expert witness.

O'Flannagan contends that Ochsner invited the court to admit exhibit 33, that the statements in exhibit 33 were not opinions, that certain of the statements were cumulative evidence, and that no prejudice resulted from the admission of the exhibit. O'Flannagan also notes that Edwards was disclosed as a potential witness by both parties prior to trial.

The record shows that a number of the doctors who treated and examined O'Flannagan reviewed Edwards' report when reaching their respective conclusions. There was also testimony that the test Edwards performed was an objective test that is utilized by other doctors in making diagnoses. Neb. Evid. R. 703, Neb. Rev. Stat. § 27-703 (Reissue 2008), permits experts to base their opinions on facts that are not admissible into evidence if experts in their field reasonably rely on such facts. *In re Interest of A.M.*, 281 Neb. 482, 797 N.W.2d 233 (2011). Rule 703 specifically provides:

> The facts or data in the particular case upon which an expert bases an opinion or
> inference may be those perceived by or made known to him at or before the hearing. If of

a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 703 was designed to promote efficiency in the trial process. See *In re Interest of A.M., supra*.

Because rule 703 permitted the physicians who relied upon this test report in the course of their examination and treatment of O'Flannagan to testify about the report without it being admissible, any error in its admission into evidence was harmless. See *State v. Meduna*, 18 Neb. App. 818, 794 N.W.2d 160 (2011).

Moreover, the only statement in Edwards' report that resembles an opinion is under the "assessment" paragraph wherein Edwards indicates that it is possible that the twisting motion experienced by O'Flannagan may have "tugged on the roots and aggravated preexisting lumbar stenosis." Catlett, McCullen, and Rodriguez concluded that O'Flannagan's back injuries were the result of, or aggravated by, the incident involving Ochsner. Thus, despite the fact that there may have been an opinion in Edwards' report that was inadmissible hearsay, this opinion was cumulative to the testimony given by the other doctors as to the cause of O'Flannagan's injuries. In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party. *Werner v. County of Platte*, 284 Neb. 899, 824 N.W.2d 38 (2012). If the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact, then the erroneous admission of evidence is not reversible error. See *id*.

In this case, there were a number of other medical opinions that linked O'Flannagan's back pain symptoms to the injuries he received on June 17, 2010. Further, the other testifying doctors repeated the same information that is contained in Edwards' report. Therefore, any statements in Edwards' report were cumulative and did not prejudice Ochsner.

Finally, Ochsner's arguments regarding surprise and nondisclosure are without merit. Edwards appeared as a potential witness in each party's pretrial memorandum. Further, Ochsner utilized this report when conducting the deposition of her own expert, Taylon. A video of Taylon's deposition was played for the jury at trial, during which he testified that statements in exhibit 33 related to the absence of peripheral nerve damage or neuropathy in the leg supported his conclusion that O'Flannagan's back injuries were not related to the incident on June 17, 2010. Clearly, Ochsner was aware of this exhibit. Ochsner cannot attempt to use this exhibit in her favor in a deposition taken for trial and then claim that she was surprised when O'Flannagan later used it at the actual trial. This assigned error is without merit.

*Jury Instructions.*

Ochsner's second assignment of error asserts that the trial court erred in instructing the jury on damages. Specifically, Ochsner renews her challenge from the jury instruction conference regarding the third sentence in instruction No. 10. This instruction stated as follows:

There is evidence that [O'Flannagan] had low back pain prior to June 17, 2010. [Ochsner] is liable for any damages that you find to be proximately caused by the incident on June 17, 2010. If you cannot separate damages caused by any preexisting conditions from those caused by this incident, then [Ochsner] is liable for all of those damages.

Ochsner contends that there was evidence in the record which allowed the damages to be apportioned and that therefore, the third sentence of the instruction should not have been given.

The first two sentences of this instruction are essentially identical to the model instruction contained in NJI2d Civ. 4.09. The second sentence of the instruction comes from part IIB of the comment to NJI2d Civ. 4.09. Ochsner notes that the comment to the instruction also contains an advisement that the third sentence of the above instruction should only be rarely given.

The right of a person suffering from a disease, who is injured by reason of the negligence of another, to recover for all damages proximately resulting from the negligent act includes the right to recover for an aggravation of the preexisting disease. *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996); *Higginbotham v. Sukup*, 15 Neb. App. 821, 737 N.W.2d 910 (2007). If a plaintiff has a preexisting condition and the defendant's conduct resulted in greater damages because of that preexisting condition, the defendant is nonetheless liable for all damages proximately caused by the defendant's conduct. *Castillo v. Young*, 272 Neb. 240, 720 N.W.2d 40 (2006).

The plaintiff has the burden of proving duty, breach, causation, and resultant harm to recover in a suit in negligence. *David v. DeLeon, supra*; *Higginbotham v. Sukup, supra*. The plaintiff is not, however, required to provide a precise line between the damages directly related to the accident and any preexisting physical or mental condition the defendant can exhume as a precondition for recovering any damages at all. *Id.* Once the plaintiff presents evidence from which a jury reasonably can find that damages were proximately caused by the tortious act, the burden of apportioning damages resulting from the tort rests squarely on the defendant. *Id.*

As noted in the factual summary above, the evidence presented at trial conflicted as to the cause of O'Flannagan's injuries, particularly as it related to his back. A number of the doctors who testified on behalf of O'Flannagan believed that the accident with Ochsner was the source of his back pain or had aggravated a preexisting condition. Ochsner's expert, Taylon, however, believed that O'Flannagan's back pain was not a result of the accident. There was evidence that O'Flannagan did not have a longstanding history of prior back pain. There was testimony from Chingren that there was no way to know what parts of O'Flannagan's spine changes were trauma related as opposed to preexisting. Ochsner did not present evidence to rebut this or otherwise apportion O'Flannagan's back condition between that which may have preexisted the accident and that which was caused by the trauma. It is clear that O'Flannagan continues to have pain in his leg, back, and wrist. Therefore, from the record presented to us, the trial court's jury instruction No. 10 was proper. This assigned error is without merit.

*Jury Verdict.*

Ochsner also argues that the jury's verdict was excessive. Much of her argument relating to this assignment of error is directed toward the admission of exhibit 33 into evidence. She argues that this exhibit allowed the jury to decide the issues of causation and diagnosis on the basis of possibility, rather than a reasonable degree of medical certainty, leading to an improper verdict. Ochsner also argues that O'Flannagan's medical expenses were inflated after the complaint was filed and that his auto repair business was not profitable.

In this case, the trial court instructed the jury that it could consider a number of items when determining the amount of damages. These items included: (1) the nature and extent of the

injury, including whether the injury is temporary or permanent and whether any resulting disability is partial or total; (2) the reasonable value of the medical, hospital, nursing, and similar care and supplies reasonably needed by and actually provided to O'Flannagan and the reasonable value of the medications reasonably certain to be needed and provided in the future; (3) the wages, salary, profits, reasonable value of the working time O'Flannagan has lost because of his "inability, diminished ability" to work; (4) the reasonable value of the earning capacity O'Flannagan is reasonably certain to lose in the future; and (5) the physical pain and mental suffering O'Flannagan has experienced and is reasonably certain to experience in the future.

In order for an award to be so excessive as to warrant a new trial, it must be so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law. *Shipler v. General Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807 (2006). On appeal, the fact finder's determination of damages is given great deference. *Id*. A jury verdict will not be set aside unless clearly wrong. *Id*.

As discussed more extensively above, we have determined that Ochsner's arguments related to exhibit 33 are without merit. Therefore, further analysis into whether this exhibit improperly influenced the jury's verdict is unnecessary.

Having reviewed the record in this case, we conclude that the verdict was not excessive or clearly wrong. At trial, O'Flannagan presented evidence regarding his lost mechanic's time at his business. He testified that after sustaining injuries on June 17, 2010, he has to spend time every day elevating his leg at his desk in the shop's office in order to relieve some of the pain. While he is elevating his leg, he is unable to perform repair work. O'Flannagan testified that in 2010 and 2011, he lost approximately 1 hour of mechanic's time a day. Since 2012, he has experienced more pain and has lost an estimated 2 hours of mechanic's time per day. From 2010 to 2012, O'Flannagan charged $65, $67.50, and $70 per hour, respectively. Additionally, O'Flannagan testified that he has lost approximately $500 per week from his towing business as a result of his injuries. He is also no longer eligible to participate in AAA's incentive program based on towing volume and has lost the ability to earn the related bonuses. Further, O'Flannagan's doctors testified that they believe his injuries are permanent. Therefore, O'Flannagan will continue to lose additional income every year as a result of his injuries.

The record also shows that O'Flannagan has incurred over $20,000 in medical expenses as a result of his injuries. It is also likely that O'Flannagan will incur future medical expenses as he continues to manage his injuries.

Finally, there is evidence in the record that O'Flannagan has suffered from constant pain since his injuries. He testified that he has taken pain medication every day since the incident. There was also considerable testimony that O'Flannagan's demeanor has changed to the point where he has become short-tempered and appears to be in constant pain. O'Flannagan's injuries also affect his ability to sleep.

From our review of the record, the evidence supports the jury's award of $500,000 to O'Flannagan. Based on the record, the verdict does not appear to be the result of passion or prejudice and is not clearly erroneous. This assignment of error is without merit.

## CONCLUSION

Because we find that Ochsner's assigned errors are without merit, we affirm the judgment of the district court.

AFFIRMED.