NAOMI L. AFLAGUE, APPELLANT AND CROSS-APPELLEE,
V. MICHAEL J. LUGER, APPELLEE AND CROSS-APPELLANT.
589 N.W. 2d 177

Filed February 16, 1999.    No. A-97-331.

Steven M. Delaney, of Hascall, Jungers, Garvey & Delaney, for appellant.

William H. Selde, of Sodoro, Daly & Sodoro, for appellee.

IRWIN, Chief Judge, and HANNON and SIEVERS, Judges.

SIEVERS, Judge.

This appeal involves the jury instructions to be given when a plaintiff produces evidence of a previous injury which is alleged to make her more susceptible to the injuries suffered in the accident at issue. The plaintiff claims she is an "eggshell-skull" plaintiff and is entitled to an instruction that the defendant takes her as he finds her. Therefore, the plaintiff claims on appeal that she was prejudiced by an inadequate jury instruction and that insufficient damages were awarded.

## BACKGROUND

Naomi L. Aflague and Michael J. Luger were involved in a car accident in Omaha, Nebraska, on May 12, 1993. Aflague sued Luger on March 13, 1994, in the district court for Douglas County, Nebraska, alleging that Luger was negligent in failing to maintain a proper lookout, in failing to yield the right-of-way, and in failing to maintain reasonable control of his vehicle. Aflague alleged that she sustained injuries to her upper back, neck, and shoulders and "head and brain trauma." She asked for $5,000 in special damages, along with general damages and costs. Luger answered and alleged that the proximate cause of Aflague's damages was her contributory negligence, which was sufficient to bar her recovery. On November 13, 1995, Luger filed an offer to confess judgment in the amount of $4,500. Obviously the offer was rejected, because trial was held on February 10, 11, and 12, 1997.

Aflague testified that in May 1993, she was working at Lancer Label "doing data entry." Linda Brown, a coworker, described Aflague as outgoing and attentive to her work before the car accident. Brown testified that after the accident, Aflague "got upset easily, cried," and began complaining of headaches. Aflague also began transposing numbers in her paperwork. Aflague testified that she continued working for Lancer Label for approximately 8 months after the accident, until she was classified as "disabled" by the Social Security Administration due to her headaches and inability to focus at work.

In 1986, Aflague was involved in a fall while horseback riding. The fall resulted in a subdural hematoma on the left frontal

portion of Aflague's skull. She was in a coma for 3 months and underwent brain surgery. Aflague's rehabilitation was extensive, lasting 10 months, and required that she relearn how to walk and speak. Aflague testified that she recovered fully from this accident and lived a normal life until the date of the car accident.

In describing the 1993 car accident, Aflague testified, "My head . . . went to the side, and I don't remember if I went left first or right first, but I know [my head hit] right here on the window. It didn't knock me out or anything. . . . It thumped but I mean it was just a split second . . . ." Aflague testified that she attempted to work the following day but could not concentrate. She stated that her head hurt the entire day, that "[i]t was throbbing as far as up in the back and temple," and that the pain was constant. David Hart, a close friend, testified that before the accident, Aflague was "bubbly and friendly, very active," but that after the accident, she began to complain of headaches, sleeplessness, and anxiety. Aflague testified that prior to the car accident, she had never had any problems with any of the aforementioned things.

Aflague eventually went to see a Dr. Williams, a general practitioner. Aflague was referred to Dr. Edward Schima, a neurologist. Schima's deposition was introduced at trial. He testified that he first met with Aflague on July 12, 1993, and that she told him she had "been [in] her usual health" until the car accident. In taking her history, Schima discovered that Aflague had suffered a serious fall from a horse in 1986, had undergone a craniotomy for a subdural hematoma on the left side of her brain, and had been in a coma for 3 months as a result of her injuries. Schima stated that Aflague "did not recall having any major problem with headaches following the original injury."

Schima ordered a CAT scan and testified that the results indicated that there was "[a] collection of fluid which appeared to be of spinal fluid density in the right temporal fossa, which would be on the side opposite to the original damage that we've got reported from 198[6]." Schima opined that the fluid buildup was related to the second injury, because there had been no mention of it in Aflague's 1986 CAT scan. Schima stated that Aflague had suffered a closed head injury on May 12, 1993. He also testified that because Aflague suffered a severe head injury

in 1986, she was "more vulnerable to side effects even after relatively minor trauma that might do very little in a person who's never had an injury."

On cross-examination, Schima admitted that the fluid buildup on the right side of Aflague's brain could have occurred after the 1986 CAT scan was done, but before the May 1993 accident, and stated that Aflague's fluid buildup could be related to stress.

After consulting with Schima, Aflague met with Dr. William Marcil, a psychiatrist. Marcil's deposition was also introduced at trial. Marcil testified that he first met with Aflague on July 19, 1994, and that they discussed her horseback riding accident and the resulting injuries and rehabilitation. Marcil testified that in January 1995 he determined that Aflague was "disabled" and "incapable of working" as a result of her headaches and depression. Marcil agreed on cross-examination that if Aflague had suffered cognitive or psychological injuries as a result of her fall in 1986, "those things [would] have been part of her . . . normal behavior . . . [a]nd maybe an event like a car accident would bring out [those] deficiencies."

Aflague was also referred to Dr. Mark Cunningham, a neuropsychologist, for psychological testing. Cunningham evaluated Aflague in September and October 1994. Cunningham testified that once an individual suffers a head injury, the brain is more at risk and is more vulnerable to further injury. He testified that the "neurobattery psych exam" performed on Aflague revealed that she had recovered from the effects of her horseback riding accident. Cunningham supported this conclusion by pointing to Aflague's ability to work steadily from her recovery from the 1986 accident up to the time of the car accident. Cunningham opined that Aflague suffered brain damage as a result of the 1993 car accident and agreed with Marcil that Aflague was unable to work as a result of her injuries.

Dr. Thomas Haley, a clinical psychologist called by Luger, testified that Aflague's cognitive deficits, which he noted as a result of testing, were not the result of the car accident, but, rather, were a combination of injuries from the 1986 accident and stress.

At the jury instruction conference, counsel for Aflague proposed an instruction dealing with the "aggravation of a preex-

isting condition." The proposed instruction is not included in the record before us, and the praecipe does not request that such be included in the transcript. What Aflague represents as the proposed instruction is set out in her brief on appeal. Aflague's brief asserts that the court did not use her tendered instruction. The record shows that instruction No. 14, on preexisting conditions, was given as follows:

There is evidence that the plaintiff had symptoms resulting from a brain injury prior to May 12, 1993, the date of the accident. The defendant is liable only for any damages you find to be proximately caused by the accident.

If you cannot separate damages caused by the pre-existing brain injury from those caused by the accident, then the defendant is liable for all those damages.

On February 12, 1997, the jury returned a general verdict for Aflague in the amount of $4,000.

Aflague filed a motion for a new trial on damages, alleging that the verdict was inadequate and contrary to the law and that the court erred when "it gave the jury instruction on pre-existing conditions, instead of the proffered instruction of Plaintiff." Luger filed a motion for an order to tax costs. Luger alleged that he was entitled to recover any costs incurred after November 13, 1995, the date his "offer to confess judgment" was filed, pursuant to Neb. Rev. Stat. § 25-906 (Reissue 1995). In an order filed March 4, 1997, the district court overruled Aflague's motion for a new trial. The court sustained Luger's motion to tax costs but excluded attorney and witness fees from the definition of "taxable costs." Aflague appeals to this court.

## ASSIGNMENTS OF ERROR

Aflague argues on appeal that the district court erred in not giving her proposed instruction on preexisting conditions and aggravation of preexisting conditions and that the court erred in denying her motion for new trial. Luger, referring to himself as a "counter-appellant," argues that the district court erred in denying his motion for taxable costs and fees under § 25-906.

## STANDARD OF REVIEW

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that

(1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Walkenhorst v. State*, 253 Neb. 986, 573 N.W.2d 474 (1998).

## ANALYSIS

*Failure to Give Proposed Jury Instruction.*

It is the duty of the appellant to direct the clerk to include in the transcript any tendered instruction refused by the trial court if the appellant intends to assign error to such refusal. *Lange v. Crouse Cartage Co.*, 253 Neb. 718, 572 N.W.2d 351 (1998). As we have previously mentioned, Aflague's proposed jury instruction is not in our record on appeal, but she recites the proposed instruction in her brief. A party's brief may not expand the evidentiary record, *R-D Investment Co. v. Board of Equal. of Sarpy Cty.*, 247 Neb. 162, 525 N.W.2d 221 (1995), nor may it expand this court's transcript. Nonetheless, it is the duty of the trial judge to instruct the jury on the issues presented by the pleadings and the evidence, whether requested to do so or not, and a failure to instruct on the proper law of the case constitutes prejudicial error. *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998). Therefore, despite not having Aflague's proposed instruction, we still examine whether the jury was properly instructed on Aflague's preexisting condition.

In *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996), the defendant, Edith DeLeon, ran a stop sign and struck the vehicle of the plaintiff, Lawrence David. The trial court directed a verdict in favor of David on the issue of liability and submitted the issue of damages to the jury. The jury awarded David $45,571.74. The evidence showed that prior to the collision, David had suffered from mild generalized arthritis in his back and knees.

Certain damages claimed by David were immediately apparent from the moment of the collision, i.e., concussion, loss of memory, fractured rib, and contusions to the head, ear, shoulder, and left knee. After his hospitalization, David sought and received treatment for his knees, as well as for neck pain.

At trial, DeLeon tendered proposed jury instruction No. 1 on damages, which read as follows:

"There is evidence that the plaintiff had degenerative disc disease of the cervical spine (also called spondylosis), spinal stenosis of the lumbar spine, and degenerative arthritic changes in the knees prior to the date of the accident. The defendant is liable only for any damages that you find to be proximately caused by the accident."

*DeLeon*, 250 Neb. at 113; 547 N.W.2d at 729.

The trial court rejected this instruction and instead gave David's proposed jury instruction No. 11, which embodies both the first and second paragraphs of NJI2d Civ. 4.09:

"There is evidence that the plaintiff had pre-existing back and joint conditions prior to the date of the accident. The defendant is liable only for any damages found to be proximately caused by the accident.

"If you cannot separate damages caused by the pre-existing conditions from those caused by the accident, then the defendant is liable for all of those damages."

*Id.*

This instruction mirrors the one given by the trial court in the case before us. The Nebraska Supreme Court in *DeLeon* held that the instruction given by the trial court "was the correct statement of the law and that it did not misstate the burden of proof." 250 Neb. at 114, 547 N.W.2d at 730. The *DeLeon* court recited that in *McCall v. Weeks*, 183 Neb. 743, 164 N.W.2d 206 (1969), the court had adopted the theory of the "eggshell-skull" plaintiff, whom the negligent defendant must take as he is.

However, approximately 7 months after its decision in *DeLeon*, the Nebraska Supreme Court again discussed the theory of the "eggshell-skull" plaintiff in *Ketteler v. Daniel*, 251 Neb. 287, 556 N.W.2d 623 (1996). Marilyn Ketteler filed suit against Carl Daniel for injuries sustained in a motor vehicle collision in April 1991. Liability was admitted, and the jury trial was limited to the issue of damages. The jury awarded Ketteler $42,875.94. The evidence showed that in 1974, well before the collision, Ketteler noticed lumps in her breast, which she had removed by Dr. John Gatewood. The problem reoccurred in 1977, at which time Gatewood removed the tissue from both of Ketteler's breasts for the purpose of decreasing her heightened risk of cancer. At the same time, Ketteler's breasts were reconstructed with silicone gel implants.

During the initial impact of the 1994 car accident, Ketteler's car spun, her shoulder restraint tightened, and her body slammed into the restraint. As the car continued to spin, Ketteler's body continued to go forward, and the seatbelt raked across Ketteler's chest. Ketteler went to see her family physician, Dr. Dwaine Peetz, 3 days after the accident. According to his records, the seatbelt had squeezed Ketteler's right implant, and the area of the right implant was tender. Ketteler continued to see Peetz for several months after the accident because she had been suffering from neck pain and flu-like symptoms. A mammogram later revealed that Ketteler's implants had ruptured. In February 1994, Dr. William Palmer, a rheumatologist, diagnosed Ketteler as suffering from fibromyalgia, a soft-tissue syndrome which causes patients to experience generalized musculoskeletal pain in the neck, back, and joints.

At the conclusion of the evidence, an instruction conference was held. Ketteler proposed the following jury instruction:

> "There is evidence that Marilyn Ketteler had a preexisting neck and back condition prior to the date of this collision. The Defendant is liable only for any damages that you find to be proximately caused by the collision of April 26, 1991.

> "If you cannot separate damages caused by the preexisting condition from those caused by the accident, then the Defendant is liable for all of those damages.

> "The Defendant may be liable for bodily harm to Marilyn Ketteler even though the injury is greater than usual due to the physical condition which predisposed Marilyn Ketteler to the injury. In short, the Defendant takes the Plaintiff as he finds her."

*Ketteler,* 251 Neb. at 295-96, 556 N.W.2d at 629. It is noteworthy that Ketteler's proposed instruction, while identical in its first two paragraphs to the *DeLeon* instruction, contained a third paragraph not present in *DeLeon,* and not given in the case before us. It is this third paragraph which is our focus.

The trial court rejected Ketteler's suggestion and instead instructed that " '[t]here is evidence that the plaintiff had a neck, back and hip condition prior to the accident of April 26, 1991. The defendant is liable only for any damage that you find to be

proximately caused by the accident of April 26, 1991.'"
*Ketteler,* 251 Neb. at 291, 556 N.W.2d at 626.

Ketteler appealed and argued that the court erred when it eliminated paragraphs 2 and 3 of her proffered instruction. The Nebraska Supreme Court agreed with Ketteler and, after recounting its holdings in *David v. DeLeon,* 250 Neb. 109, 547 N.W.2d 726 (1996), and *McCall v. Weeks,* 183 Neb. 743, 164 N.W.2d 206 (1969), said:

> Consistent with our previous decisions in *David* and *McCall,* we hold that Ketteler's *entire* proffered instruction should have been submitted. First, the proffered instruction correctly stated the law. Second, the instruction was warranted by the evidence offered by Dr. Palmer, who testified that Ketteler suffered from fibromyalgia prior to the accident, and by Dr. Peetz, who testified by deposition that Ketteler had suffered from back and neck conditions prior to the accident which were aggravated by the accident. Finally, refusal by the trial court to submit the *entire* proposed instruction was prejudicial to Ketteler.

(Emphasis supplied.) *Ketteler v. Daniel,* 251 Neb. 287, 298, 556 N.W.2d 623, 630 (1996).

Although the record does not contain Aflague's proposed instruction in its entirety, the record does reveal that her tendered instruction was apparently based on the Nebraska Supreme Court's holding in *Ketteler.* At the instruction conference, Aflague's attorney stated:

> We did speak a little bit about [it] yesterday regarding the giving of the *third paragraph* as in our proposed instructions. We would ask that the Court do that. As the [Supreme] Court's previously indicated in the <u>Ketteler v. Daniel</u> case, that that *entire* instruction as set out in our proposed instruction is the one that should be given in its entirety.

(Emphasis supplied.)

Aflague argues on appeal that by "not instructing the jury on the fact that Appellant was an 'eggshell skull' plaintiff, Appellant was prejudiced [sic] by not informing the jury completely in the law." Brief for appellant at 11. Clearly, the third

paragraph of the *Ketteler* instruction is the "eggshell-skull" part of the instruction.

We read *Ketteler*, and the Nebraska Supreme Court's express approval of all three paragraphs of Ketteler's tendered instruction, as expanding the necessary jury instruction in cases where there is evidence that the plaintiff is an "eggshell-skull" plaintiff. As a result of *Ketteler*, juries are to be told that defendants take plaintiffs as they are when there is evidence of preexisting conditions which predispose the plaintiff to injury or greater injury than would occur without the preexisting conditions. From the viewpoint of Aflague's evidence, she is the quintessential "eggshell-skull" plaintiff, because she introduced evidence of a serious preexisting and predisposing brain injury, followed by what would appear an inconsequential auto accident which produced a far more serious brain injury than would be expected. The instruction approved in *David v. DeLeon, supra*, contained only the first two paragraphs of Ketteler's proposed instruction. And, the jury here was instructed in accordance with *DeLeon*. But, *Ketteler* requires that when the evidence justifies it, a trial court must add an additional paragraph to the *DeLeon* instruction. When the plaintiff produces evidence to support the "eggshell-skull" theory, generally, evidence of a preexisting condition which predisposes the plaintiff to injury and damage, then the notion embodied by the third paragraph of *Ketteler* must be given as follows: The defendant may be liable for bodily harm to the plaintiff even though the injury is greater than usual due to the physical condition which predisposed the plaintiff to the injury. In short, the defendant takes the plaintiff as the defendant finds the plaintiff.

It is hard to envision a case which would more strongly justify using the third paragraph from *Ketteler* than Aflague's case. We point out that the second paragraph from *DeLeon* addresses the question of apportionment of damages by advising a jury what to do if damages caused by the preexisting condition and the accident cannot be separated. If they cannot be separated, then the jury awards the plaintiff his or her entire damages. However, the third paragraph from *Ketteler* addresses a different matter—a subtle facet of causation. This paragraph

enables a jury to understand that a defendant, under Nebraska law, can be liable for the total harm to a plaintiff from an accident even though the injury was greater because of the plaintiff's preexisting physical condition than would usually be caused by such an accident.

Therefore, the third paragraph from *Ketteler* which advises the jury that Luger takes Aflague "as he found her," including her preexisting susceptibility to brain injury as a result of her accident in 1986, was required. Of course, if it is a disputed factual matter, then the question of whether Aflague had proved that she, in fact, had such a preexisting susceptibility, must be left to the jury as part of the causation equation.

It is the duty of the trial court to instruct on the proper law of the case, and failure to do so constitutes prejudicial error. *Wheeler v. Bagley*, 254 Neb. 232, 575 N.W.2d 616 (1998). We hold that instruction No. 14 in the instant case did not properly instruct the jury on the law applicable to the case. We therefore reverse the decision of the trial court and remand the cause for a new trial. Our decision moots Luger's purported cross-appeal that the district court erred in failing to award costs.

REVERSED AND REMANDED FOR A NEW TRIAL.