Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/25/2019 09:06 AM CDT

Carl Bank and Teresa M. Bank, appellants,
v. Jason J. Mickels, M.D., and Omaha
Orthopedic Clinic & Sports
Medicine, P.C., appellees.
___ N.W.2d ___

Filed April 25, 2019.    No. S-18-427.

1.  **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.
2.  **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, which an appellate court independently decides.
3.  **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.
4.  **Motions for Mistrial: Appeal and Error.** Decisions regarding motions for mistrial are directed to the discretion of the trial court and will be upheld in the absence of an abuse of discretion.
5.  **Motions for New Trial: Appeal and Error.** An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.
6.  **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
7.  **Trial: Evidence: Witnesses: Impeachment.** A ruling on evidence of a collateral matter intended to affect the credibility of a witness is within the discretion of a trial court.
8.  **Statutes: Appeal and Error.** Generally, statutory language is to be given its plain and ordinary meaning, and an appellate court will not

resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

9. **Health Care Providers: Informed Consent.** Neb. Rev. Stat. § 44-2816 (Reissue 2010) does not require that informed consent be written.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed.

Jason M. Bruno and Jared C. Olson, of Sherrets, Bruno & Vogt, L.L.C., for appellants.

William M. Lamson, Jr., and William R. Settles, of Lamson, Dugan & Murray, L.L.P., for appellees.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

MILLER-LERMAN, J.

## I. NATURE OF CASE

Carl Bank and Teresa M. Bank sued Dr. Jason J. Mickels and Omaha Orthopedic Clinic & Sports Medicine, P.C. (collectively Mickels), in the district court for Douglas County for medical malpractice and loss of consortium. Their complaint alleged that Dr. Mickels breached the standard of care because he failed to obtain informed consent before performing an injection and manipulation procedure on Carl's shoulder and failed to diagnose and treat an infection that ultimately caused permanent injury and serious daily pain. During the jury trial, the court made various rulings regarding the admission of evidence, including witness testimony, and jury instructions, with which the Banks take issue. A jury returned a general verdict in favor of Mickels. The court overruled various posttrial motions by which the Banks had requested a new trial. The Banks appeal. We analyze the Banks' assignments of error below and determine that they are without merit. We specifically conclude that Neb. Rev. Stat. § 44-2816 (Reissue 2010) does not require informed consent to be written and that the court's jury instruction to

that effect was a correct statement of the law and warranted by the evidence. We affirm.

## II. STATEMENT OF FACTS

Our statement of facts is taken from the evidence presented at trial. Carl's physician referred him to Dr. Mickels, an orthopedic surgeon, for a rotator cuff tear in August 2012. Dr. Mickels performed surgery to repair the rotator cuff in September 2012. Following the surgery, Carl kept his arm in a sling and completed physical therapy and recommended exercises. At the first postoperative visit, on October 2, Carl was recovering as expected. Carl testified that soon after, in early October, he was slammed forward into the passenger restraints in his automobile when his wife braked to avoid colliding with another vehicle. Carl testified that his pain had continued, but not worsened, after the braking incident. He returned to Dr. Mickels to make sure that the near-collision had not affected his shoulder. Carl testified that Dr. Mickels performed x rays and stated that "everything was fine, all the pins were in place and not to worry about it."

According to Carl's testimony, not everything was fine. Carl continued to experience pain when he followed up with Dr. Mickels on November 20, 2012. Dr. Mickels injected a local anesthetic into the shoulder joint to allow him to test the range of motion in Carl's affected shoulder. The purpose of the procedure was to assess the range of motion without pain to determine if Carl's limited range of motion was due to inadequate pain controls. Dr. Mickels testified that he and Carl discussed the risk of increased pain after an injection and range of motion procedure and that they discussed the risk of infection from any injection. Dr. Mickels noted that Carl had tattoos and was not a "stranger to needles," and according to Dr. Mickels, Carl stated he had never had an infection from receiving any of his tattoos. Carl testified that Dr. Mickels did not explain the risks of the manipulation and injection. Carl did not sign an informed consent form for the

procedure and testified that he would not have agreed to go forward with the injection and procedure if the risks had been explained to him. During the range of motion procedure, as Dr. Mickels raised the arm, Carl heard cracking and popping noises in his shoulder. He recalled that Dr. Mickels told him those sounds were "a good sign" of scar tissue breaking down. During the procedure, Dr. Mickels observed that Carl "had a pretty stiff shoulder," so he prescribed additional physical therapy.

Carl testified that his shoulder was more painful after the November 2012 procedure. He reported that his range of motion was continuing to decline and that his pain was severe. At trial, Carl attributed the pain to the November injection and procedure. Dr. Mickels testified that his medical records attributed Carl's worsening pain to the automobile incident in October.

In December 2012, Dr. Mickels ordered x rays and an MRI. Dr. Mickels described the MRI results and testified that the findings pointed to a stress fracture or, less likely, avascular necrosis. He recommended that Carl take a break from therapy and perform exercises at home to rest over the next couple of weeks. At this point, Carl was back to work with restrictions.

Carl returned on December 20, 2012, at which time Dr. Mickels noted some muscular atrophy in Carl's shoulder. Dr. Mickels asked a partner physician to observe Carl to see if he had "any other ideas." Dr. Mickels ordered electrodiagnostic studies to evaluate nerve function, and Carl's results were normal. At the next visit, on January 9, 2013, Dr. Mickels recommended that Carl return to therapy and continued his work restrictions.

At this point, Carl had not improved, and he sought a second opinion from Dr. Charles Rosipal, an orthopedic surgeon, on January 14, 2013. Dr. Rosipal ordered a CT scan and suspected an infection. He requested a radiologist to perform a CT-guided needle aspiration to obtain material to culture and

check for bacteria. However, the culture was negative and Dr. Rosipal noted, "There does not appear to be any active infection in the shoulder."

Dr. Rosipal scheduled shoulder replacement surgery for April 1, 2013, but when he opened Carl's shoulder, he found that a serious infection had eroded essentially all of the cartilage in the joint. Dr. Rosipal installed a temporary joint and prescribed strong antibiotics. A permanent replacement joint was installed in May 2013.

Carl has severe ongoing shoulder pain and stiffness that requires frequent physical therapy treatments and reduces his quality of life. He avoids public places because of the risk of someone's bumping into him.

The Banks brought this action in the district court for Douglas County, claiming medical malpractice and loss of consortium against Mickels. Their complaint alleged that Dr. Mickels breached the standard of care required of medical providers in Omaha, Nebraska, because he failed to obtain informed consent before performing an injection and manipulation procedure on Carl's shoulder and because he failed to diagnose and treat an infection. The Banks alleged that Dr. Mickels' negligence caused the infection to destroy Carl's joint before another doctor could treat it.

Trial was held on December 11 through 14, 2017. Both parties called expert witnesses. The Banks called two experts, Drs. Sonny Bal and Roger Massie, the latter of whom appeared by deposition. Dr. Bal is an orthopedic surgeon from Columbia, Missouri. He testified that Dr. Mickels fell below the standard of care by failing to obtain informed consent for the November 20, 2012, procedure, stating, "There's some question as to whether or not the patient was informed. And if the patient was not told or given the information that a reasonable health care provider would give, that's below the standard of care." According to Dr. Bal, the standard of care required the patient be given information that there was a risk of a fracture and a risk of infection.

Dr. Bal also testified that Dr. Mickels fell below the standard of care because "despite many, many pieces of evidence pointing to an infection, [Carl] never got a workup or evaluation for infection." Dr. Bal testified that Dr. Mickels performed the rotator cuff repair properly, but that Carl's lack of improvement after surgery was a "red flag."

On cross-examination, Mickels' counsel questioned Dr. Bal about the compensation he received for his work as an expert witness in this case. Mickels' counsel offered several bills into evidence that documented Dr. Bal's expert witness fees. These were received without objection. On redirect, the Banks' counsel asked Dr. Bal what he does with the money he earns from expert witness work. Mickels objected on the basis of relevancy. In an offer of proof, the Banks' counsel represented that Dr. Bal donated this money to charity. The district court sustained Mickels' objection to this question.

The Banks also called Dr. Massie, a family physician from Malcolm, Nebraska, whose opinions were generally similar to Dr. Bal's. Dr. Massie explicitly opined that the standard of care required that Dr. Mickels obtain written informed consent from Carl for the November 20, 2012, procedure. Dr. Massie explained that written consent is "a generic form that is signed by the patient that you have in detail explained to the patient the risk, benefits, complications that could accrue to such procedure."

Mickels called Dr. John Wright as an expert witness on the standard of care. Dr. Wright is an orthopedic surgeon who practices general orthopedics in Kearney, Nebraska. Dr. Wright testified to his schooling, training, experience, and publications. Dr. Wright became board certified by the American Board of Orthopaedic Surgery in 2001 and recertified in 2010. His practice predominantly involves joint replacement surgery and sports medicine and includes rotator cuff repairs.

Dr. Wright testified that Dr. Mickels' care and treatment of Carl met the standard of care and that Dr. Mickels obtained appropriate informed consent for the November 20, 2012,

procedure. He testified that the injection into Carl's shoulder "was done according to acceptable techniques and community standards." He opined that the procedure did not cause Carl's infection or fracture. Later in the trial, the Banks unsuccessfully sought to strike Dr. Wright's testimony.

Although the Banks had not objected to the following question during the receipt of evidence, after both parties had rested, the Banks moved for a mistrial, arguing that Dr. Wright had mentioned insurance deductibles during his testimony, which violated an order in limine prohibiting the mention of insurance. The relevant testimony was as follows:

Q [by Mickels' counsel:] Okay. Do you have any — any operation scheduled where you're going to be replacing either a shoulder or operating on a shoulder or doing a rotator cuff repair?

A [by Dr. Wright:] Several. My surgery schedule is booked full through February right now.

Q Okay. This is usually a busy time of year because of the deductibles and everybody kind of wants to get that elective surgery in, am I right?

A Right.

Q Okay.

A For better, for worse, I don't have a slow time of year anymore.

The district court overruled the Banks' motion for mistrial.

Next, the Banks moved to strike all of Dr. Wright's testimony because they claimed he had not established that he was familiar with the standard of care in Omaha or similar communities. The district court also overruled this motion.

Dr. Mickels also testified as to his treatment and care of Carl. He testified that a rotator cuff repair "is one of the more painful surgeries . . . in orthopedics" and that it takes up to 6 weeks for the shoulder to "heal enough to withstand the individual's own motion and active motion of that arm."

At trial, the Banks requested a jury instruction based on NJI2d Civ. 4.09 regarding the activation or aggravation of a

preexisting condition. The district court refused the proposed instruction. Regarding the jury instructions actually delivered, the court modified NJI2d Civ. 12.03 and advised the jury that "[a] written consent is not required in order for a physician to meet the standard of care."

After the jury returned a general verdict in favor of Mickels, the Banks filed a motion to alter or amend the judgment and a motion for a new trial, which were denied. The Banks appealed.

## III. ASSIGNMENTS OF ERROR

The Banks make various claims on appeal which are summarized and restated as follows: With regard to the expert witnesses at trial, the Banks claim that the district court erred when it declined to strike Dr. Wright's testimony for lack of familiarity with community standards and should have permitted Dr. Bal's additional testimony regarding his donative intent for his expert witness fee. They assert that the district court erred when it instructed the jury that written consent is not required for informed consent and when it refused to instruct the jury on the aggravation of a preexisting condition. They further claim that the district court erred when it overruled the Banks' various motions concerning the reference to insurance and the collateral source rule, their motion for mistrial, their motion to alter or amend the judgment, and their motion for new trial.

## IV. STANDARDS OF REVIEW

[1] The standard for reviewing the admissibility of expert testimony is abuse of discretion. *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018).

[2] Whether a jury instruction is correct is a question of law, which an appellate court independently decides. *First Nat. Bank North Platte v. Cardenas*, 299 Neb. 497, 909 N.W.2d 79 (2018).

[3] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden

to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017).

[4] Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion. *Hike v. State*, 288 Neb. 60, 846 N.W.2d 205 (2014).

[5,6] An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion. *Hemsley v. Langdon, supra*. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## V. ANALYSIS

### 1. Objections to Expert Witness Testimony

#### (a) Objection to Dr. Wright's Testimony

The Banks request a new trial because the district court declined to strike Dr. Wright's testimony about the standard of care. They argue that Dr. Wright lacked foundation to opine on the standard of care in Omaha because he practices in Kearney and did not specifically testify he was familiar with the standard of care in Omaha. We reject this assignment of error.

The applicable standard of care for cases arising under the Nebraska Hospital-Medical Liability Act, Neb. Rev. Stat. § 44-2801 et seq. (Reissue 2010), includes a locality focus. *Hemsley v. Langdon, supra*. To establish the customary standard of care in a particular case, expert testimony by a qualified medical professional is normally required. *Id*. This testimony is premised on the expert's personal knowledge of, and familiarity with, the customary practice among medical professionals in the same or similar locality under like circumstances. *Id*.

In this case, Mickels designated Dr. Wright to testify regarding the standard of care. Dr. Wright testified that "[w]hen [Carl's] shoulder was injected with local anesthetic, it was done according to acceptable techniques and community standards."

Given that Dr. Wright was trained at the national level and, at the time of trial, served on the faculty of the University of Nebraska, there was evidence from which we can assume the jury reasonably found that the locality standard had been satisfied when it returned a general verdict for Mickels. See, also, *Hamilton v. Bares*, 267 Neb. 816, 678 N.W.2d 74 (2004) (comparing Bellevue, Nebraska, and Lincoln, Nebraska); *Walls v. Shreck*, 265 Neb. 683, 658 N.W.2d 686 (2003) (comparing North Platte, Nebraska, and Scottsbluff, Nebraska).

### (b) Relevance Objection Regarding Dr. Bal's Expert Witness Fees

The Banks next contend that the district court abused its discretion when it sustained Mickels' objection to testimony meant to rehabilitate Dr. Bal. At trial, Mickels attempted to impeach Dr. Bal's credibility by portraying him as a profiteering "traveling witness," and the Banks wished to show that Dr. Bal donates expert witness fees to charity and that he is worthy of belief.

[7] Given the context of the ruling, we determine that the Banks have failed to demonstrate that they were prejudiced by the court's ruling which excluded additional testimony by Dr. Bal. A ruling on evidence of a collateral matter intended to affect the credibility of a witness is within the discretion of a trial court. *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990). The district court did not abuse its discretion.

### 2. JURY INSTRUCTIONS

With regard to jury instructions, the Banks claim that the district court erred when it modified a pattern instruction on informed consent and refused to give an instruction on

activation or aggravation of a preexisting condition. Neither claim has merit.

### (a) Form of Informed Consent Under § 44-2816

The Banks contend that oral consent alone is not sufficient to satisfy informed consent under § 44-2816 and that the district court erred when, in a modification of pattern jury instruction NJI2d Civ. 12.03, it instructed the jury over objection that "[a] written consent is not required in order for a physician to meet the standard of care." The Banks contend that the modification was contrary to law. We do not agree.

In Nebraska, actions against qualified healthcare providers for failure to obtain informed consent are governed by the Nebraska Hospital-Medical Liability Act. § 44-2801 et seq. Section 44-2816 provides:

> Informed consent shall mean consent to a procedure based on information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities. Failure to obtain informed consent shall include failure to obtain any express or implied consent for any operation, treatment, or procedure in a case in which a reasonably prudent health care provider in the community or similar communities would have obtained an express or implied consent for such operation, treatment, or procedure under similar circumstances.

We have said informed consent concerns a doctor's duty to inform his or her patient of the risks involved in treatment or surgery. *Curran v. Buser*, 271 Neb. 332, 711 N.W.2d 562 (2006) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32 (5th ed. 1984)). It is settled that § 44-2816 requires doctors to

> "provide their patients with sufficient information to permit the patient himself to make an informed and

intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all. . . ."

*Eccleston v. Chait*, 241 Neb. 961, 967, 492 N.W.2d 860, 864 (1992).

Quoting Fay A. Rozovsky, Consent to Treatment: A Practical Guide § 1.0 (2d ed. 1990), the Supreme Court of Kentucky explained, "'Consent is a process, not a document. Authorization for treatment is the culmination of a discussion . . . . The documentation, the so-called consent form, is not the consent, for that lies instead in the conclusion of the discussion between the patient and the physician . . . .'" *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (1997). We agree with this description of consent and conclude it is consistent with informed consent under § 44-2816.

[8,9] We have not explicitly decided whether informed consent reflecting the receipt of information described in § 44-2816 must be in writing. Generally, statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Wisner v. Vandelay Investments*, 300 Neb. 825, 916 N.W.2d 698 (2018). The statutory language of § 44-2816 is not ambiguous, requiring a patient to receive "information which would ordinarily be provided to the patient under like circumstances by health care providers engaged in a similar practice in the locality or in similar localities." The plain meaning of the language addresses the extent of information to be given. Section 44-2816 does not prescribe the form for providing the information and, to the contrary, states that informed consent may be "express or implied," suggesting that the requirement of the statute can be met in more than one form. The

Legislature did not require that informed consent be written. Although some states mention written informed consent in their general informed consent statutes, Nebraska does not. See Christine Coughlin, *E-Consent: Can Informed Consent Be Just a Click Away?*, 50 Wake Forest L. Rev. 381 (2015). We will not insert a writing requirement where the Legislature has not restricted the form of informed consent, and we therefore hold that § 44-2816 does not require that informed consent be written.

Our reading of § 44-2816 is consistent with other jurisdictions that have considered the issue under similar informed consent statutes. See, e.g., *Cooper v. U.S.*, 903 F. Supp. 953 (D. S.C. 1995); *Holley v. Huang*, 284 P.3d 81 (Colo. App. 2011); *Rowe v. Kim*, 824 A.2d 19 (Del. Super. 2003), *affirmed* 832 A.2d 1252 (Del. 2003); *Kovacs v. Freeman, supra*; *Yahn v. Folse*, 639 So. 2d 261 (La. App. 1993); *Patterson v. Van Wiel*, 91 N.M. 100, 570 P.2d 931 (N.M. App. 1977).

The court's jury instruction was a correct statement of the law and was warranted by the evidence. Although the court's instruction was triggered by the evidence in the case, we do not rule that this modified instruction must be given in every case. To the extent the Banks suggest they were disadvantaged by the instruction, we reject the argument. The jury heard the testimony of the Banks' witness, Dr. Massie, who urged that informed consent be written, and by its verdict, the jury did not accept that testimony.

### (b) Activation or Aggravation of Preexisting Condition Proposed Jury Instruction

At trial, the Banks requested and the district court rejected a jury instruction regarding the activation or aggravation of a preexisting condition, based on NJI2d Civ. 4.09. The district court rejected the proposed instruction. On appeal, the Banks claim the district court erred when it rejected their proposed instruction. We find no merit in this assignment of error.

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction. *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018). However, if the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal. *Id*.

When the jury returns a general verdict for one party, an appellate court applies the general verdict rule and presumes that the jury found for the successful party on all issues raised by that party and presented to the jury. See *id*. In similar cases, we presumed that the jury found for appellees on all issues presented to it, and we have interpreted the verdict as finding that the plaintiff failed to prove that the defendant was the proximate cause of the plaintiff's injuries. See *id*. A preexisting condition instruction concerns the apportionment of damages. See *David v. DeLeon*, 250 Neb. 109, 547 N.W.2d 726 (1996). Here, the jury did not reach a special verdict, and thus, its verdict was a general verdict. See Neb. Rev. Stat. § 25-1122 (Reissue 2016). When it reached a general verdict, the jury presumably decided that Dr. Mickels' conduct was not the proximate cause of Banks' injuries, and the jury never reached the issue of damages or preexisting conditions. The Banks were not prejudiced when the district court rejected their proposed preexisting condition instruction, and they cannot show reversible error.

### 3. COLLATERAL SOURCE RULE VIOLATION: REFERENCE TO INSURANCE

Finally, the Banks claim that the district court erred when it denied the Banks' motion for mistrial and motion to alter or amend and for a new trial based on a question asked by counsel

for Mickels of Dr. Wright on direct examination. The Banks contend that the question and answer violated both the collateral source rule and the district court's order in limine that prohibited the reference to insurance. See, also, *Countryside Co-op v. Harry A. Koch Co.*, 280 Neb. 795, 790 N.W.2d 873 (2010). Under the circumstances presented by this case, the brief, casual, and isolated mention of "deductibles" does not warrant a new trial.

The testimony in question was as follows:

Q [by Mickels' counsel:] Okay. This is usually a busy time of the year because of the deductibles and everybody kind of wants to get that elective surgery in, am I right?

A [by Dr. Wright:] Right.

Q Okay.

A For better, for worse, I don't have a slow time of year anymore.

Our precedent in *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005) (superseded by statute on other grounds as noted in *Kelly v. Saint Francis Med. Ctr.*, 295 Neb. 650, 889 N.W.2d 613 (2017)), is relevant here. Not every casual or inadvertent reference to an insurance company in the course of trial will necessitate a mistrial. *Genthon v. Kratville, supra.* We have stated that "[w]hether the disclosure is such as to constitute error depends essentially upon the facts and circumstances peculiar to the case under consideration." *Id*. at 87, 701 N.W.2d at 347.

The Banks did not object to Mickels' counsel's question or move to strike the answer during the receipt of evidence, but they did move for a mistrial after the parties had rested. Ignoring the issue of whether the "deductibles" reference was inadvertent, the exchange was not emphasized. The reference did not telegraph to the jury information on whether Carl had received the benefits of health insurance which might have reduced his damages in this case. The effect of the question and answer was mitigated by jury instructions that explained

the collateral source rule. Under the circumstances of this case, it was not prejudicial to the Banks and does not warrant a new trial.

## VI. CONCLUSION

For the reasons explained above, we find no merit to the Banks' assignments of errors and specifically hold that § 44-2816 does not require that informed consent be written.

AFFIRMED.